IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DANA C., | ) |
|     Plaintiff, | ) ) ) |
|     v. | ) No. 20-cv-3671 ) ) Magistrate Judge Jeffrey I. Cummings |
| KILOLO KIJAKAZI,[1] Commissioner of Social Security, | ) ) ) |
|     Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Dana C. ("Claimant") brings a motion for summary judgment to reverse the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for disability insurance benefits ("DIBs"). The Commissioner brings a cross-motion for summary judgment seeking to uphold the decision to deny benefits. The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. §636(c). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §405(g). For the reasons that follow, Claimant's motion to reverse the decision of the Commissioner, (Dckt. #18), is denied and the Commissioner's motion to uphold the decision to deny benefits, (Dckt. #23), is granted.

**I.    BACKGROUND**

    **A.    Procedural History**

On June 6, 2017, Claimant (then forty-three years old) filed an application for DIBs, alleging disability dating back to February 1, 2017, due to limitations stemming from chronic

---

[1] In accordance with Internal Operating Procedure 22 - Privacy in Social Security Opinions, the Court refers to Claimant only by her first name and the first initial of her last name. Acting Commissioner of Social Security Kilolo Kijakazi has also been substituted as the named defendant. Fed.R.Civ.P. 25(d).

1

daily migraines with stroke symptoms, interstitial cystitis, chronic pelvic pain, chronic fatigue syndrome, spinal murmur, irritable bowel syndrome, pain-induced syncope, aortic valve regurgitation, and degenerative disc disease. (Administrative Record ("R.") 221). Claimant's date last insured was March 31, 2022. (R. 15). Her claim was denied initially and upon reconsideration. Claimant filed a timely request for a hearing, which was held on April 25, 2019, before Administrative Law Judge ("ALJ") Cynthia M. Bretthauer. (R. 34-81). On May 30, 2019, the ALJ issued a written decision denying Claimant's application for benefits. (R. 10-30). Claimant filed a timely request for review with the Appeals Council. On January 7, 2020, the Appeals Council denied Claimant's request for review, leaving the decision of the ALJ as the final decision of the Commissioner. (R. 1-6). This action followed.

      **B.**      **The Social Security Administration Standard to Recover Benefits**

To qualify for disability benefits, a claimant must demonstrate that she is disabled, meaning she cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. §404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. 20 C.F.R. §404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. §404.1520(a)(4)(i). At step two, the SSA determines whether a claimant has one or more medically determinable physical or mental impairments. 20 C.F.R. §404.1521. An impairment "must result from anatomical, physiological, or psychological abnormalities that can be shown by medically

2

acceptable clinical and laboratory diagnostic techniques." *Id.* In other words, a physical or mental impairment "must be established by objective medical evidence from an acceptable medical source." *Id.*; *Shirley R. v. Saul*, 1:18-cv-00429-JVB, 2019 WL 5418118, at *2 (N.D.Ind. Oct. 22, 2019). If a claimant establishes that she has one or more physical or mental impairments, the ALJ then determines whether the impairment(s) standing alone, or in combination, are severe and meet the twelve-month duration requirement noted above. 20 C.F.R. §404.1520(a)(4)(ii).

At step three, the SSA compares the impairment or combination of impairments found at step two to a list of impairments identified in the regulations ("the listings"). The specific criteria that must be met to satisfy a listing are described in Appendix 1 of the regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a listing, she is considered disabled and no further analysis is required. If the listing is not met, the analysis proceeds. 20 C.F.R. §404.1520(a)(4)(iii).

Before turning to the fourth step, the SSA must assess the claimant's residual functional capacity ("RFC"), or her capacity to work in light of the identified impairments. Then, at step four, the SSA determines whether the claimant is able to engage in any of her past relevant work. 20 C.F.R. §404.1520(a)(4)(iv). If the claimant can do so, she is not disabled. *Id.* If the claimant cannot undertake her past work, the SSA proceeds to step five to determine whether a substantial number of jobs exist that the claimant can perform given her RFC, age, education, and work experience. If such jobs exist, she is not disabled. 20 C.F.R. §404.1520(a)(4)(v).

    C.    **The Evidence Presented to the ALJ**

Again, Claimant seeks DIBs due to limitations from chronic daily migraines with stroke symptoms, interstitial cystitis, chronic pelvic pain, chronic fatigue syndrome, spinal murmur,

3

irritable bowel syndrome, pain-induced syncope, aortic valve regurgitation, and degenerative disc disease. (R. 221). Claimant alleges an onset date of February 1, 2017. Because Claimant's arguments on appeal concern only her migraines, (Dckt. #18 at 10), the Court limits its discussion of the evidence accordingly.

1. **Medical Records Related to Claimant's Migraines**

Claimant began treating with pain specialist Yulia Kin-Kartsimas, M.D., on August 24, 2016. (R. 403). At the time, Dr. Kin noted that Claimant had a long history of migraines with "hemiplegic type and stroke symptoms." (*Id.*). Claimant reported experiencing headaches more than fifteen times per month and more than six times per day, sometimes lasting for a few days. (*Id.*). She experienced nausea as well as phono- and photophobia during the headaches, which were also aggravated by neck pain. (*Id.*). Claimant informed Dr. Kin that most treatment (including abortive and prophylactic medications) had failed. (*Id.*). Dr. Kin diagnosed hemiplegic migraines, a rare form of migraine with stroke-like symptoms, such as weakness on one side of the body, and changes in vision, speech, or sensation.[2] She prescribed oxycodone for breakthrough pain and oxycontin for daily chronic pain. (R. 404).

On September 16, 2016, Claimant informed Dr. Kin that the medications provided "some tolerable pain control." (R. 406). On November 14, 2016, Claimant reported that her pain was tolerable with the medications. (R. 412). On December 16, 2016, Claimant again reported that her pain was "controlled with scheduled meds." (R. 414). On January 13, 2017, she reported that she was in the midst of a migraine that had lasted for twelve hours and while her medications were making the migraine "more tolerable," they had not stopped it. (R. 416). Dr. Kin noted that Claimant was wearing sunglasses in a dark room. (R. 417).

---

[2] American Migraine Foundation, *Hemiplegic Migraine: Symptoms and Treatments*, (Jan. 6, 2022), https://americanmigrainefoundation.org/resource-library/hemiplegic-migraine/.

Claimant was brought to the Emergency Room on February 3, 2017, after cutting her wrists at home. (R. 502). Claimant told responding law enforcement officials that she had lost her job and "her history of migraines [was] bad and she did not want to deal with it anymore." (*Id.*). Claimant told the Emergency Room treating provider that she had "migraines every day [which] impair her speech and vision when they [were] severe." (R. 521). Seven days later, on February 10, 2017, Claimant informed Dr. Kin that her headaches were "controlled except when they are worse with stress." (R. 419).

Claimant again reported that her pain was controlled on March 8, 2017. (R. 421). On April 5, 2017, she reported that her pain was "better tolerated" and that "she [could] handle her headaches most of the time except on the days when barometric pressure changes all the time." (R. 423). Claimant did not complain of migraines at an appointment with Dr. Kin on May 2, 2017, (R. 425), but later that day she presented to the Emergency Department with complaints of migraines "typical of her usual migraine headache," with nausea, some vomiting, and photophobia, (R. 313-15). A CT scan revealed no acute intracranial processes. (R. 316). Claimant did not complain of migraines at a May 24, 2017 appointment with Dr. Kin. (R. 427).

While treating with Dr. Kin, Claimant was also receiving care from the Veterans Affairs Medical Center. She presented there for an evaluation of her chronic migraines on June 7, 2017, at which time she informed her treating provider, Mark J. Trelkam, M.D., that her headaches had become more frequent over the past eighteen months, occurring twice per week with each lasting one or more days. (R. 303). Claimant explained that some headaches were triggered by eating "pork, chocolate, or cheeses," but most were present when she woke up in the morning. (R. 303). She described the pain as "throbbing, squeezing, or stabbing," and explained that the headaches were preceded by spots and "zig-zag lines" in her vision, which sometimes

5

culminated in complete loss of vision in her left eye. (R. 303). Other symptoms included nausea, intolerance to light, intolerance to noise, and incapacitation. (*Id.*). The headaches caused her to vomit about five percent of the time. (*Id.*). Claimant reported that she had experienced approximately four headaches that were accompanied by left hemiparesis, including mouth drooping and dysarthric speech, the last of which had occurred four years prior. (R. 303-04). Claimant also noted that Tizanidine worked "very well as an abortive med." (*Id.*). Despite her symptoms, Claimant continued "to lead an active lifestyle, riding high level jet skis (i.e. jumping 10 foot waves, riding for several hours standing up, etc.)." (R. 306).

On November 14, 2017, Claimant required an impromptu visit with Dr. Kin due to unrelenting migraines. (R. 603). Dr. Kin observed that Claimant "might benefit from Botox injections [since] she failed most of the regimens for migraine treatment." (*Id.*). On January 9, 2018, Dr. Kin described Claimant's headaches as "persistent." (R. 608). On January 10, 2018, Claimant went to the Emergency Department for a painful hemiplegic migraine. (R. 769). She reported tingling on the left side of her face, speech difficulties, and photophobia. (*Id.*). She had attempted to take abortive medications but had been unable to keep them down.

Claimant was scheduled to receive Botox injections on February 5, 2018. (R. 610). Although her migraines were again described as persistent and aggravated by cold weather, Dr. Kin noted that "scheduled medications work well for her." (*Id.*). A few minutes into the appointment, Claimant started having slurred speech, which she stated was normal during her migraine episodes. (R. 611). Claimant's husband came to take her home and the injections were rescheduled. (*Id.*). Claimant received Botox injections on February 7, 2018. (R. 613).

On March 6, 2018, Claimant informed Dr. Kin that her migraines had become "better tolerated, less intense, and shorter in duration." (R. 614). On May 29, 2018, however, Claimant

reported that her migraines had returned despite great symptom relief for two to three months. (R. 895). When Claimant visited the Emergency Department the next day, May 30, 2018, due to a skin rash, she did not complain of migraines and informed the treating provider that she had spent "all weekend jet-skiing." (R. 636).

In addition to the impairments noted above, Claimant also struggled with opioid dependence throughout the alleged disability period. On July 17, 2018, Dr. Kin decided to stop treating Claimant because she had repeatedly requested additional drugs from her primary care provider without contacting Dr. Kin's office to report a shortage of medication or an exacerbation of pain. (R. 904).

Claimant's primary care physician during the relevant time frame was James Patrick Earley, D.O., at Veterans Affairs. To address her opioid dependence, Claimant began treating with suboxone on January 8, 2019. (R. 1433). On January 30, 2019, she reported that she was tolerating her medications well and felt that her symptoms were well controlled. (R. 1428). She described her pain as a two out of ten. (R. 1427). On February 5, 2019, Claimant reported that she was "pain free." (R. 1424). Claimant's headaches were described as "stable" on February 6, 2019, and she again reported "much success" with the use of suboxone and described her pain as only two out of ten. (R. 1419).

Claimant met with pain psychologist Judith Miller on February 25, 2019. She reported that she was still struggling with migraines and had had three within the last two days. (R. 1541). However, Claimant reported that these migraines did not cause her to vomit, that she was having a good response to her suboxone treatment, and that her overall pain levels had decreased substantially since she began suboxone treatment. (*Id.*). Although a physical therapy note from March 5, 2019, indicated that Claimant had missed a few prior appointments due to migraines,

7

(R. 1522), on March 6, 2019, Claimant described her headaches as "stable" with Xanax and suboxone therapy. (R. 1412). Claimant experienced a hemiplegic migraine on March 13, 2019, (R. 1404), but it was described as "not intractable" and "not limiting." (R. 1406).

### 2. Opinion from Claimant's Treating Physician

Claimant's primary care practitioner, Dr, Earley, completed an RFC statement on Claimant's behalf on July 11, 2018. He diagnosed her with hemiplegic migraines, among other problems. (R. 591). He opined that although Claimant's symptoms were "relatively controlled" with medications, her pain was frequently severe enough to interfere with the attention and concentration needed to perform simple work tasks. (*Id.*). He further opined that Claimant would need to lie down for about four hours per eight-hour workday, would be off task for thirty percent of the workday, and would be absent four days per month. (R. 592-94).

### 3. Evidence from State Agency Consultants

Frank Mikell, M.D., reviewed Claimant's file on August 29, 2017. He considered listing 11.02 (for epilepsy), among others, and found that Claimant did not meet its criteria. (R. 88). He prescribed various environmental limitations due to Claimant's history of migraines and concluded that Claimant was not disabled. (R. 91-92). Prasad Kareti, M.D., reviewed Claimant's file on reconsideration on January 13, 2018. He also considered listing 11.02 and found that it was not met. (R. 105). He concurred with Dr. Mikell's findings regarding the appropriate RFC restrictions to account for Claimant's migraines. (R. 109).

### D. The ALJ's Decision

The ALJ applied the five-step inquiry required by the Act in reaching her decision to deny Claimant's request for benefits. At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since her alleged onset date of February 1, 2017. (R. 1275). At

step two, the ALJ determined that Claimant suffered from the severe impairments of cervical and lumbar spine degenerative disc disease, migraines with a history of syncope, depressive disorder, unspecified trauma and stressor related disorder, somatic symptom disorder, and polysubstance use disorder in early remission. (R. 16).

At step three, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled one of the Commissioner's listed impairments, including "the 11.00 listings." (R. 17-18). Before turning to step four, the ALJ determined that Claimant had the RFC to perform light work with the following limitations:

> [She could] frequently push, pull, and reach overhead with the bilateral upper extremities; frequently stoop, crawl, crouch, and kneel; occasionally climb stairs and ramps; never climb ladders, ropes, or scaffolds; avoid even moderate exposure to unprotected heights, or moving and hazardous machinery; avoid concentrated exposure to dust, odors, fumes, gases, temperature extremes, humidity, noise and vibration; no more than incidental contact with the general public; no more than occasional contact with coworkers and supervisors and no more than routine workplace changes.

(R. 19). Based on this conclusion, the ALJ determined at step four that Claimant could not perform any of her past relevant work. (R. 25-26). Even so, at step five, the ALJ concluded that a sufficient number of jobs existed in the national economy that Claimant could perform given her age, education, work experience, and RFC, including the representative jobs of mail clerk, hand packager, and sorter. (R. 26-27). As such, the ALJ found that Claimant was not disabled from her alleged onset date through the date of her decision. (R. 28).

## II.  STANDARD OF REVIEW

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. §405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). "Substantial

evidence is not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021), *quoting Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal quotation marks omitted). The Commissioner's decision must also be based on the proper legal criteria and be free from legal error. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts, resolving conflicts, deciding credibility questions, making independent symptom evaluations, or otherwise substituting its judgment for that of the Commissioner. *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413.

### III. ANALYSIS

Claimant alleges that the ALJ erred by failing to: (1) assess whether her migraines equaled a listing; and (2) properly account for limitations stemming from Claimant's migraines in the RFC analysis. Respectfully, the Court finds otherwise.

### A.     The ALJ's step three findings do not require reversal.

Citing no case law, Claimant argues that the ALJ's assessment of her neurological disorders was "fatally incomplete" because she failed to consider whether Claimant's migraines medically equaled listing 11.02 (epilepsy) (Dckt. #18 at 11). The Court disagrees.

The listings describe impairments considered "severe enough to prevent an individual from doing any gainful activity, regardless of [her] age, education, or work experience." 20 C.F.R. §§404.1525(a), 416.925(a). They "were designed to operate as a presumption of disability that makes further inquiry unnecessary." *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). To match a listed impairment, the claimant bears the burden of showing that her impairment meets "all of the specified medical criteria." *Id.* at 530. "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Id.*

Although there is no specific listing for migraines, the Commissioner routinely considers this impairment under the criteria for listing 11.02, which relates to epilepsy. *See Horner v. Berryhill,* No. 17 C 7586, 2018 WL 3920660, at *2 n.1 (N.D. Ill. Aug. 16, 2018); *Jozefyk v. Saul*, No. 19-CV-1606, 2020 WL 5876063, at *3 (E.D.Wis. Oct. 2, 2020) (collecting cases). Sections 11.02(B) and 11.02(D), in particular, are used to consider a claimant's severe headaches. To medically equal 11.02(B), a claimant must experience migraines that are equal in severity to dyscognitive seizures at least once a week for three consecutive months despite adherence to prescribed treatment. SSR 19-4p, 2019 WL 4169635, at *7. To medically equal paragraph D, a claimant must experience migraines equal in severity to dyscognitive seizures at least once every two weeks for at least three consecutive months despite adherence to prescribed treatment, as well as marked limitations in one functional area (such as adapting or managing oneself). *Id.*

11

In making her step three argument here, Claimant does not outline listing 11.02's criteria, let alone explain how she meets each of those criteria with citations to the record. (Dckt. #15 at 9). In fact, although Claimant faults the ALJ for failing to analyze listing 11.02 more thoroughly, she never goes so far as to assert that her migraines did, in fact, equal this listing. "It is not this court's responsibility to research and construct the parties' arguments," and Claimant's failure to make a properly supported argument on each of these points dooms her listing argument. *Carter v. Astrue*, 413 Fed.Appx. 899, 906 (7th Cir. 2011) ("[C]onclusory analysis will be constructed as waiver."). The fact that Claimant failed to file a reply after the Commissioner pointed out these shortcomings further supports a finding of waiver. *See, e.g., Dorota K. M. v. Berryhill*, No. 17-cv-4349, 2018 WL 5298532, at *5 (N.D.Ill. Oct. 25, 2018) (even if the ALJ erred with respect to the listings analysis, "any such error is harmless unless Dorota demonstrates that she meets all the criteria of Listing 11.02" and "[n]owhere in her opening or reply brief does Dorota address those criteria").

Furthermore, Claimant has not satisfied the requirements of SSR 17-2p, which requires that the record contain one of the following pieces of evidence for an ALJ to conclude that an individual is disabled based on medical equivalence:

> (1) a prior administrative medical finding from [a medical consultant] or [psychological consultant] from the initial or reconsideration adjudication levels supporting the medical equivalence finding; or
>
> (2) [medical expert] evidence, which may include testimony or written responses to interrogatories, obtained at the hearings level supporting the medical equivalence finding; or
>
> (3) a report from the [Appeals Council's] medical support staff supporting the medical equivalence finding.

SSR 17-2p, 2017 WL 3928306, *3. Claimant has cited no such evidence in the record, and therefore, there is no basis for a finding of medical equivalence. *See Erica V. v. Saul*, No. 20 C

1106, 2020 WL 6381364, at *4 (N.D.Ill. Oct. 30, 2020) (claimant's argument that her symptoms were equivalent in severity to those described in a listing was insufficient to demonstrate medical equivalence where she did not identify any evidence from medical experts regarding equivalency as required under SSR 17-2p); *Sherrod v. Kijakazi*, No. 4:21-cv-49-RJ, 2022 WL 4130766, at *4 (E.D.N.C. Sept. 12, 2022) (same). Indeed, the only medical experts who explicitly considered listing 11.02 – the state agency consultants – found that Claimant did *not* meet or medically equal it. (R. 88, 105).

Finally, the Court notes that an ALJ's "articulation of the reason(s) why [a claimant] is or is not disabled at a later step in the sequential evaluation process will provide rationale that is sufficient for [the court] to determine the basis for the finding about medical equivalence at step [three]." SSR 17-2p, 2017 WL 3928306, at *4; *see also Erica V.*, 2020 WL 6381364, at *5 (finding no step three error where the ALJ's discussion of the effects of the claimant's impairment "picked up in the next part of the ALJ's decision"). The ALJ's detailed discussion of Claimant's migraines in the RFC assessment, addressed below, provides the necessary logical bridge from the evidence to her finding that Claimant's migraines did not equal listing 11.02.

      **B.**    **The ALJ adequately accounted for Claimant's migraines in the RFC assessment.**

Claimant next argues that the ALJ failed to properly account for limitations stemming from her migraines in the RFC assessment. In particular, Claimant argues that the ALJ: (1) failed to properly assess the evidence pre-dating Claimant's alleged onset date; (2) failed to address a particular note from Claimant's February 2017 hospital visit; (3) mischaracterized Claimant's complaints to treating physicians as contradictory; (4) improperly cherry-picked evidence related to Claimant's improvement in order to support her RFC findings; and (5) failed

13

to explain why Claimant did not require a migraine-related off-task limitation. The Court disagrees on all counts and will address each argument in turn.

1. **The ALJ adequately addressed the evidence pre-dating Claimant's February 2017 onset date.**

First, while Claimant asserts that the ALJ's assessment of the evidence pre-dating her alleged onset date was "woefully spartan," (Dckt. #18 at 12), she fails to explain why any of the omitted evidence contradicts the ALJ's ultimate RFC findings. An ALJ "is not required to address every piece of evidence or testimony presented," *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009), so long as she does not ignore an entire line of evidence contradicting her conclusions. *Idoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2009).

Here, the ALJ noted that Claimant had "described migraines associated with head pain, aura, nausea, vomiting, and vision loss," prior to her alleged onset date of February 1, 2017. (R. 19). The ALJ went on to describe the records detailing Claimant's experience with migraines *during* the disability period and explain how she factored this evidence into her RFC findings. The Court does not see – and Claimant does not explain – how additional references to the pre-disability period would have altered this analysis. It was appropriate for the ALJ to discuss this evidence in less detail than evidence from within the proposed disability period. *See Mowatt v. Colvin*, No. 15 C 5521, 2016 WL 3951626, at *7 (N.D.Ill. July 21, 2016) (the fact that records pre-date the alleged onset date is "a factor that should be considered under 20 C.F.R. §404.1527(c) and SSR 96-8p").

2. **The ALJ properly considered the evidence from Claimant's February 3, 2017 hospital visit.**

Claimant next asserts that the ALJ failed to address a treatment note from her February 3, 2017 visit to the hospital indicating that she had a history of migraines and experienced them

14

every day.  However, the ALJ explicitly discussed this hospital visit and even acknowledged that Claimant complained of migraines at that visit.  (R. 20).  The ALJ also noted that, despite those complaints, Claimant was "repeatedly observed to be resting comfortably throughout her admission."  (R. 20).  Again, Claimant fails to explain why the omitted details would require greater RFC limitations.  *See Grotts v. Kijakazi*, 27 F.4th 1273 (7th Cir. 2022) ("Summaries of medical evidence, while definitionally 'partial and selective,' are appropriate.").

> 3. **The ALJ did not mischaracterize the record when finding that Claimant's treatment records were inconsistent among her various providers.**

Claimant also takes issue with the ALJ's statement that Claimant's "contemporaneous reports to her primary doctors at the VA contradict what she indicated to Dr. Kin" regarding her migraines.  (R. 21).  In support of this finding, the ALJ cited appointments with Dr. Kin between March 8 and May 24, 2017, during which Claimant did *not* complain of headaches.  *See* (R. 421) (pain was "better controlled"); (R. 423) (pain was "better tolerated" and Claimant could handle headaches "most of the time"); (R. 427) (no new complaints of migraines).  The ALJ contrasted these reports with the notes from a June 7, 2017 VA appointment during which Claimant informed her doctor that her headaches had *worsened* over the past eighteen months.  (R. 303). In this regard, the ALJ's reasoning is supported by substantial evidence; nothing more is required.

> 4. **The ALJ did not impermissibly cherry-pick evidence related to Claimant's improvement.**

On March 6, 2018, Claimant informed Dr. Kin that her migraines had become "less intense and shorter in duration."  (R. 614).  The ALJ cited this as evidence that Claimant's migraines were "mostly controlled."  (R. 22).  Claimant now argues that "the ALJ did not bother to mention" notes from six doctor's appointments – on February 5, 2018, February 7, 2018, May

15

29, 2018, February 25, 2019, March 5, 2019, and March 13, 2019 – which "torpedo[] [the] ALJ's assertion that [Claimant's] migraines had improved." (Dckt. #18 at 14). The Court first notes that the ALJ did mention one of these appointments. *See* (R. 22) (noting that Claimant presented with slurred speech during a February 5 office visit with Dr. Kin). More importantly, the Court finds that none of the records cited by Claimant contradict the ALJ's finding that Claimant's condition had improved with treatment.

First, Claimant's complaints of migraines on February 5 and 7 preceded her Botox treatment, which is what caused Claimant to report improvement on March 6, as explained by the ALJ. Second, while it is true that Claimant reported that her migraines had returned on May 29, June 26, and July 24, 2018, (R. 895, 898, 905), the ALJ cited records *post-dating* these exhibits in which Claimant continued to describe improving symptoms with other treatment methods (namely, suboxone). *See* (R. 1428) (January 30, 2019 note describing Claimant's symptoms as well-controlled); (R. 1424) (February 5, 2019 note that Claimant was "pain free"); (R. 1419) (February 6, 2019 report that Claimant's headaches were "stable" and she was experiencing "much success" with the use of suboxone). Third, even when Claimant reported migraines in 2019, treatment notes indicated they were less severe than before. *See* (R. 1541) (February 25, 2019 report indicated that Claimant was having migraines, but they did not cause her to vomit and her overall pain levels had decreased); (R. 1412) (March 6, 2019 report that Claimant's headaches were "stable" with Xanax and suboxone); (R. 1404) (a hemiplegic headache on March 13, 2019, was described as "not intractable" and "not limiting").

Claimant cites these six doctors' appointments to show that she had "continuing problems with migraines" and to dispel any notion that her "migraines were not serious." (Dckt. #18 at 14). But the ALJ never doubted that Claimant's migraines continued, nor did she suggest that

they were not serious. Indeed, the ALJ found Claimant's migraines to be "severe," (R. 16), and accounted for them with various limitations in the RFC, (R. 25), which were specifically recommended by state agency consultants, (R. 92, 109). Because Claimant has not shown that the ALJ ignored an entire line of evidence contrary to her ultimate RFC findings, Claimant's cherry-picking argument also falls short.

### 5. The ALJ adequately addressed Claimant's need for off-task time.

Finally, Claimant accuses the ALJ of failing to address restrictions related to absenteeism and off-task time stemming from her migraines. (Dckt. #18 at 15). The only evidence Claimant cites supporting a need for such restrictions is Dr. Earley's opinion that Claimant would be off task for thirty percent of the workday and absent four days per month. (Dckt. #18 at 7) (citing R. 594). However, the ALJ explicitly addressed Dr. Earley's findings and found them to be both internally inconsistent *and* inconsistent with Dr. Earley's own treatment notes. (R. 25). Claimant fails to acknowledge or contest this assessment. Accordingly, because the ALJ properly discounted the only evidence supporting an off-task or absentee restriction identified by the Claimant, she was not required to find such a restriction.

Moreover, the ALJ's finding that Claimant's migraines had improved also supported her decision not to incorporate an off-task limitation. *See, e.g., Lawrence J. v. Saul*, No. 19-cv-1834, 2020 WL 108428, at * (N.D.Ill. Jan. 9, 2020) (finding the ALJ adequately supported the decision not to include a migraine-related off-task time restriction by pointing to evidence that the claimant was able to manage his migraines with medication). For both of these reasons, the ALJ's decision not to include a migraine related off-task restriction in the RFC was supported by substantial evidence.

## CONCLUSION

For the foregoing reason, Claimant's motion to reverse the Commissioner's decision to deny her DIBs, (Dckt. #18), is denied and the Commissioner's motion for summary judgment, (Dckt. #23), is granted. The decision of the Commissioner is affirmed.

**ENTERED:   March 30, 2023**

**Jeffrey I. Cummings
United States Magistrate Judge**